My name is Randy Rumpf. I represent Rafat Mohammed Khani, who is affectionately known as Dr. Khani to those of us who know her. In November of 2005, after a nine-day jury trial, where the jury heard the testimony of 32 witnesses, a number of documents were admitted as exhibits involving hundreds of pages, including an audio tape, the jury decided in favor of my client on the two claims that she presented, hostile work environment and retaliation. They awarded her a verdict of $310,000. Subsequently, in September of 2006, the lower court granted a new trial based upon two major issues. One was the juror de Rije issue. The other was excessiveness of damages. I will address that issue first, the new trial issue. The de Rije issue is settled by the Supreme Court's McDonough case. In McDonough, the Supreme Court said to get a new trial based on juror misconduct, you have to show, one, he failed to honestly answer a material question on voir dire. Juror de Rije was honest. He stood up on day two and said, I forgot to tell you something during voir dire. So he wasn't dishonest. And then you have to further show. Well, he was dishonest the first time. I'm sorry. No. He didn't remember the first time. He said he didn't remember coming to court, he recalled it on the day two. So. The district judge doesn't have to believe him when he says he didn't remember. Well. The district judge was there, saw him, and could say you lied the first time. Well, that's not what he said, though. He testified under oath on day two. No, I understand. People often testify in ways that the fact finder does not believe. The judge could have looked at him and said, you snuck onto the jury by telling a lie. You claim you didn't, that you forgot, but I don't believe it. He didn't make that finding, though, and that's not what the juror testified to. He said he would keep his, he testified, my wife had a case of discrimination three years earlier. And the judge questioned him and said, can you be fair and impartial? That's at ER 694 and 695. He said, yes, I can keep that separate. I can be fair and impartial. I can be fair in this case. The defendants made it clear we want him stricken. Now, that's on day two of a nine-day jury trial. The judge said I'll take it under advisement. Day three, four, five, six, seven, eight, nine go by. He doesn't rule. He lets the juror go out to deliberate. And then he tells us I'm still taking that under advisement, and after a plaintiff's verdict comes back, says he shouldn't have deliberated. I would submit that's an error of law, even though there's a reviews of discretion standard on a new trial motion. If there's an error of law, I believe under McDonough there was an error of law because there was, there is no evidence in this record that he was biased. So your contention would be that if you agree with Judge Kaczynski's evaluation of what the district judge did that found him to be dishonest, he should have eliminated him on day two when he stood up and said I didn't tell you the truth yesterday. Or day three or four or five or six or seven or eight or nine. He let it go until after the verdict came back. Okay. That was an error of law, and he didn't follow McDonough. What makes that an error of law? Because he didn't follow McDonough. Under McDonough, the only evidence in the record was what the juror said under oath. There's no evidence that he was. What makes it an error of law for the judge not to rule on McDonough? Because under McDonough the Supreme Court said there has to be evidence that they, that would provide a valid basis for challenge for cause. And the only evidence in the record is that Juror DeRije said I can be fair and impartial. That is not evidence. I don't think you heard my question. Okay. I'm sorry. Just listen to the question.  What is it that says that the judge had to rule on day two or day three, that he couldn't take in the submission? You said it's an error of law. And I'm asking you for authority as to the timing, that you say it's an error of law for him not to have ruled earlier. Well, he said in the new trial order I would have stricken him during voir dire. Why didn't he strike him on day two when he found out I think this juror is biased? That's a good question, but that's not the question I asked. That's not the answer to the question I asked. You said it's an error of law. So I'm asking you for authority. I'm asking you for a statute or a case or, you know, some authority for a proposition that it's an error of law. I would cite McDonough and I would cite FRCP 48. Let's look at McDonough. What is it in McDonough that says the judge has to rule on it on day two? It said that he has to find that he was dishonest. He did find that. Well, if it involves a mens rea element, I'm not sure. The juror testified. Where does McDonough speak about timing? I'm sorry? Where does McDonough speak about timing? It doesn't. It was an after the fact. It was after the jury came back that they discovered it, not in the middle of the trial. Remember my question? My question was what is your support for your assertion that this was an error of law? FRCP 48 says you need only six jurors. He could have stricken him on day 2, 3, 4, 5, 6, 7, 8, or 9. Could have. He would have been fine. Could have, and no doubt you're right about that. But you want to argue more than could have, you must say he must have. Well, I believe there's a. He was required to and failure to rule earlier was an error of law. He said, you know, he said, made that statement. And I keep asking him for, you know, this is the last time I'm going to ask the question. And then, you know, we can go on to something else. So if you want, if you have authority supporting the proposition this was an error of law, now's the time to say it. I've said we've done an NRCP 48 is what I or FRCP 48 is what I would fall back on. It seems rather odd that a judge would find a juror that he felt was biased and allow him to deliberate and then say he shouldn't have deliberated. That to me, I don't have any authority for that. I mean, I couldn't find any, but it seems like under FRCP 48 where you only need six jurors, that that is a clear error of law. You know, there's lots of authority about the broad discretion of district judges to conduct trials, to make, to exercise discretion in managing a trial. We accord, like every other court of appeals in the Supreme Court, accord a great deal of deference to district judges in conducting trials. This is just the nature of the process. We're not there. We can't see the witnesses. We're not involved in day-to-day operations. And so judges must have a great deal of discretion. So that's the background against which you operate. But it's clearly an abuse of discretion to keep a juror on that the judge felt should have been stricken and was biased. That makes no sense to me. Why you let him go deliberate and then say, oops, I made a mistake. I shouldn't have let him deliberate after the fact. On day two, he knew he should have, at least in this judge's mind, in day two, I should have stricken him. FRCP 48 says I only need six. We've got eight. I can strike him. That to me just sounds ipso facto like an error of law. But he also erred in the damages issue. He said in his new trial order that the damages were excessive. In that order, and I would quote it, it's in Excerpts of Record 5. We judge that by abuse of discretion, right? Yes. And it's an abuse of discretion to not calculate emotional distress damages. And that's what this Court just held in a very recent case that I have not had an opportunity to give you because it was just rendered days ago. It's the Tortu versus Las Vegas Metropolitan Police Department case. This Court held it as an abuse of discretion. It was the same context. New trial order, plaintiff's verdict. It was a motion for judgment notwithstanding or as a matter of law and a new trial. The lower court granted both. Did you give this case to opposing counsel? I just heard of it, Your Honor, and I just decided on Monday that it applied. Like while you were sitting here on the lawn? We discussed it outdoors very briefly. When did you hear about the case? I'm sorry? When did you learn about the case? Just last week, late last week. And it wasn't until Monday that I really got to look at it and decide that it applied. And then yesterday I was in an arbitration and it slipped my mind to get that to opposing counsel. And I apologize for that. But in that case, the Court held that if it's an error of law to not consider emotional distress damages, and he didn't. He said in the new trial order there was insufficient evidence to support a $250,000 verdict on the retaliation claim. And he said the only evidence that he would consider would be the cost of additional travel to the new place of employment. That's not emotional distress damage. So he specifically excluded a consideration of emotional distress damages. And he even went further and committed another error of law by saying we have to have medical evidence of emotional distress damages. That's not what this Court said in Pasatino. Pasatino says that's not required. He said, and that's in his new trial order also. I thought the new trial order awards $5,000 in damages for emotional distress and that the judge made specific findings that no more than $5,000 would be warranted because her husband testified that her physical symptoms improved after her transfer. No, he said if you look at page 5. I'm looking at page 1601 of the excerpts of record. I'm looking at excerpts of record 5. It's the new trial order, and I quote, the evidence against UMC supported at most a claim of approximately $13,000 in actual damages for retaliation. And I'm only on the retaliation claim. Assuming for the moment that the jury had sufficient evidence to find the transfer was retaliatory, this amount was based on plaintiff's calculation of the cost of additional travel to her new place of employment. That was $8,000. $8,000 in additional travel costs due to the additional travel and $5,000 in emotional distress. The $5,000 was awarded by the jury on the hostile work environment claim. Well, that's the only way you get to $13,000, though. Don't they make specific findings about the $8,000? Well, he said that the $13,000 was from the new trial order. He said the $13,000 was the cost of travel. Nevertheless, he still did not consider, and under a new trial or an excessiveness of damages standard, although it's an abuse of discretion, you have to look at the evidence in the light most favorable to the plaintiff. That's the Finner case that we cited. And he didn't do that. He didn't take into account the testimony of her and her husband. He didn't even address that. He didn't take into account the fact that she was working in a very unsafe environment. That was confirmed by other doctors. He didn't take into account that she testified, I feel persecuted on a daily basis working here because I was retaliated against. And if you take that evidence and overlay it with the Pacentino and the Zhang cases, that's a lot stronger evidence there than what was upheld in those cases. And Pacentino was a $1 million verdict. In Zhang, it was a $231,000 verdict for emotional distress. So if you take that up. Kennedy, what about the $250,000 against the county? That seems pretty high. Well, again, it was a – she was now having to commute an hour and a half or longer on a daily basis. She would now set you up. No, no. Let's say it was a – she was subjected to some – but the county had some excuse for it. And really, the relation, the ratio there is very high. The punitives to the actual damages. No, the punitives was against the individual only. I thought there was $250,000 against the county. No, that was compensatory damages, not punitive. That was what? Compensatory damages. $250,000? No, no, no. There was no punitives against the county. $250,000, I read. That was compensatory damages. Really? Yes, not punitive. The punitive was $50,000 against Anthony individually with $5,000 in compensatory. So it was a 10-to-1 ratio. But then I thought there was a judgment against the county. There was for retaliation. Yeah. And they held that the retaliation damages, which were emotional distress, was $250,000. That's what I'm thinking of. That seems totally disproportionate. Well, that's not what this Court held in Pasatino, though, Your Honor. The Court in Pasatino upheld a $1 million verdict for emotional distress damages only. And the evidence in that case showed that plaintiff suffered less distress. The Court in Zane here upheld a $231,000 emotional distress judgment based only on the plaintiff's testimony. You know, we don't really uphold. What we do is affirm or reverse district judges. In Pasatino, we affirm the district judges upholding, right? Yes. Okay. It's quite different here where we have district judge on the scene exercising discretion. And what you're asking us is to reverse a district judge's exercise of discretion in adjusting the damages. So it's really quite different. Well, we affirm under a very broad standard. We reverse under a very differential standard. You've got about a minute left. Do you want to save it for rebuttal? Jeff Pittegoff on behalf of UMC and Dr. Anthony. Counsel talked ‑‑ it may please the Court. Counsel talked a little bit about the disqualification ‑‑ or not the disqualification, but rather the issue on whether or not there should have been a new trial. And one of those issues was the juror. The juror that was at question was not the only reason why the Court granted a new trial. And in that regard, there were a number of issues. And so when you look at it in its entirety, it's clear that the judge had so much on his plate and had to think about it that during the time of the trial, he wanted to see whether or not the case was going to be decided in a fair and impartial manner. Well, what more did he discover in the seven days after he basically accepted the juror? What new evidence did he get? Well, it was more than just ‑‑ let me back up just one second. Here's basically the setting that the judge had. Judge Dawson was faced with a juror who came in, and then there was a discussion between counsel after the case had already started about this juror who now disclosed something that he would have recused the juror. Disclosed it from him. Yeah, we know that. And secondly, he noticed on his own that there were jurors who were making noises. Whether or not that meant anything is something that he wanted to consider. Was this juror making noises? He didn't really say anything in the record. And I wasn't counsel of record at the time, so I wasn't there at the trial, but I can tell you that the record does not reflect that this particular juror was making those noises. But what more did he find out about this man? About this man, nothing, other than the fact that there was the disclosure that he made. But there were other things that he also learned. He learned that the trial was much different than he had expected. The trial was not just simply about a case of ‑‑ it became a case of employee labor relation law, and it was a big factor for which the judge did not allow voir dire on a number of different, on those same exact issues at the time that the jury was being selected. And so he considered that in addition to the fact that he had jurors making noises that he wanted to decide whether or not that actually impacted the impartiality of the panel. And then he had this juror who he thinks was the cause of the taint of the jury to begin with. So in light of all of that, plus he used it as a cross check to determine whether or not the verdicts of themselves were excessive, and that's clearly what he found. And Your Honor is exactly right. The $250,000, although it was compensatory, certainly sounds awfully punitive when you look at the record as a whole. Why did you not appeal his denial of the motion for judgment as a matter of law or his earlier denial of the motion for summary judgment? I mean, you go through two more years of procedure until he invites you to file a motion for summary judgment on the issue of qualified immunity. Wasn't the right vehicle to appeal the denial of the motion for judgment? I don't believe so. I think that in this case what had happened was that initially there was the 59 motions at the end of the case that were briefed, and then he, in that motion for the new trial right at the very end, it also indicated that the retaliation claim was going to be dismissed against the University Medical Center. At that point, he reopened essentially the case and said, go forward, I want this thing to go to trial for the second half of the other issues that were remaining. And at that point, we were sitting there going, we have every single bit of evidence that we're going to have in this case. This is a case that needs to be dismissed on motion, and there were a number of issues that were not addressed in that summary judgment motion that was initially filed. For instance, the Farragher issues. And we brought all of those up in that second motion for summary judgment so that the judge could get a full understanding of all the issues that we had with a record to support it. And you didn't raise them in the Rule 59 motions? I mean, why not raise them then? What more did you have two years later? Well, we did raise the issues that we could raise in that motion. Trial counsel raised all the issues that she had at the time, at least thought were issues at the time. And at that point, it was determined that the case was still likely available for a summary judgment motion because of the issues that the judge had not addressed, specifically the qualified immunity issue against Dr. Anthony and the Farragher defense, which wasn't really decided early on in the case. And those issues, once they were brought to the judge's attention, he looked at the whole entire record as a whole, and clearly, I mean, you can look at this case and you can see that this is not a case of racial and gender discrimination based upon discrete acts. This is a facially neutral case. This is a case where there are a list of events that counsel and appellant have provided this court that have absolutely nothing to do other than minor instances of direct national origin and gender discrimination. The rest of the case is just pure speculation and innuendo. I mean, the best example is the desk. I mean, you can go through each one of the items that you have in this list of 30-odd, whatever that appellant wants to point out. And if you look at the desk issue, which is that Dr. Muhammad Kani wanted to make the innuendo that because she didn't have a desk, it was because she was a woman. And then you go back and you look at the record of what the judge had on this, he clearly saw that there was no evidence directly to support that. There was testimony that specifically identified that nobody was assigned a desk. But the innuendo is she didn't have a desk because she was a woman. And that was clearly the case. Well, I'm sorry to hammer at this, but I still don't understand. I mean, the trial's over. You know, you move for motion under or for judgment under Rule 59, denied. You had all this that you're just arguing to us available to you at the time. Why not appeal that? I mean, what possible reason is there not to go forward on an appeal at that time rather than let this drag out for two more years? Well, I don't believe that the ruling for a new trial at that time was that all of the issues had been addressed dispositively. And I think that was one of the reasons why the new motion for summary judgment addressed all the issues. Besides the fact that at the time the judge had already denied an original motion for summary judgment, I mean, I guess the same argument could be made at that point. Why wasn't that motion? I thought you were going to say you didn't think it was an appealable order. Well, I didn't think it was an appealable order. I mean, that's what I did say initially. I didn't think it was a final order when you had the new trial granted and we had additional motions that were still pending. Because at the time, I mean, there were about two, three motions, I think, still pending. But qualified immunity is something you could have taken an interlocutor appeal on. But you won on qualified immunity. That is true. However, it could have lost you. Had you lost? Had there been an earlier qualified immunity motion? I don't believe that the qualified immunity issue was addressed specifically. Did you raise it? I believe it was raised in the initial motion for summary judgment. But before the trial, you didn't raise it? Yes. It was preserved in addition as an affirmative defense, as well as I think it was briefed with the judge that he wanted it to go to the jury. In the pre-trial order? Or how was it preserved? It was preserved. Well, I don't know if it was in the pre-trial order. When did the judge have an opportunity to rule on qualified immunity? Early on in the case. What do you mean early on? There was a first motion for summary judgment, a dispositive motion that was filed in 2006 before the trial. And that was a qualified immunity argument? I believe that was addressed at that point. What do you mean? Did the judge address it? Yes. He said that he wanted it to go to the jury. Okay. So he denied it. Correct. All right. And I want to ask you about the punitives. Against the doctor, a 10-to-1 ratio is not extraordinary. Against the county, it seems pretty high. But why wasn't there a remittance of the proper solution? You brought up a couple of different issues with that question. One, counsel was right. It wasn't a punitive award against the county because it was classified as a compensatory award because under the law, a claim for punitive damages cannot be made against the public entity. However, if you do look at the 10 times ratio, which was the punitive damage award towards Dr. Anthony from the $5,000 compensatory award, the judge looked at it and said that it was just inconsistent with the evidence that he saw in the case, and inconsistent meaning he didn't even believe that there was enough evidence to even maintain support that Dr. Anthony had really violated any laws. And then on top of that, what he did was he was looking at the entire case and he's saying, and you can read this clearly from his order on the new trial, was that at the time that the evidence was being presented, Dr. Muhammad Kani had testified, and there was plenty of evidence, that the worst time in her life was the time that she was at the Craig Quick Care Facility. And that was all before the transfer. And now that there's this transfer, and Dr. Muhammad Kani was, Dr. Anthony was involved in pressing forward with this transfer, that the evidence was such that there couldn't be enough support that such a large award could be maintained against Dr. Anthony. And I think that's important to really look at in this case. You kind of have to step back. I know my time is running out, but you have to kind of step back and look at this case and not lose, as cliche as it sounds, the forest for the trees. This is a case of an employee and an employer not getting along. That's really what this case is about. And you have an employer who is taking steps to try and mitigate how this employee can get along within the group and staff positions at the Quick Care Facility. When she starts to make complaints and complaints of discrimination, it is not until she gets an evaluation from Dr. Anthony, which was as good, if not better, than most of the males at the Quick Care Facility. So now, all of a sudden, he's getting complaints once Dr. Mohamedkhani gets so mad about this evaluation of discrimination, relating back. And then the entire case that's built up in this entire instance is, I'm going to relate back everything to discrimination as the reasons why I got a bad review and why all of these facially neutral facts, such as, I'm going to call you in to talk about the claims of improper charges of x-rays, not sending people out to get their lab work done where insurance pays for it, all business reasons that University Medical Center had and relied upon to try and not become a black hole for Clark County. I also think that summary judgment was completely proper in this case, and the judge was very good at going through the evidence and determining whether or not the instances that were cited were direct evidence or had any bearing that you could go back and say were severe and pervasive enough to determine that there was an argument for hostile work environment or for any kind of gender or national origin. Well, you know, it sort of cuts both ways. He made quite an effort, but it's really the effort you might think a juror would make. He gets into weighing evidence, deciding who's telling the truth. It's fairly unusual. You bring up a very good point, because I don't think that that's what he was doing. I think what he was doing is he wasn't weighing credibility. What he was doing was he was weighing the credible evidence that he had in front of him with speculation and innuendo, and that's what he had. He didn't have absolute evidence. The innuendo were just like I had explained earlier, and we'd given a number of facts. Those were the desk incident, where it turns out that everybody was not assigned a desk. And then we have other incidents where there was a viewing of pornography on some computer, and there's only evidence that nobody saw that. The only evidence was that the plaintiff had seen something. There's evidence that there were pet names for people that Dr. Anthony had. However, the plaintiff herself never even heard these pet names. So when you look at this case, it's not a matter of the judge deciding that I'm weighing evidence. It's I have evidence, and on the other side I've just got innuendo and speculation and no basis to really allow this claim to even move forward. So if we were to affirm the grant of summary judgment on qualified immunity, would it make more sense to say there's really no constitutional violation, rather than to say, as the judge did here, that he couldn't have been aware that what he was doing was a constitutional violation? Certainly. That's the qualified immunity argument that we raised. Because he was, in light of the facially neutral conduct that we had in this case, that there is no constitutional violation. I mean, you have to have more than just sheer speculation to get to the point. But that's not what the district judge found here, didn't he? Did he base his decision on the fact that it would not have been clear to a reasonable person in Anthony's position that his conduct constituted an unlawful discrimination? Yes, that's true. That's exactly the qualified immunity argument under the SOSIA. That is. And the first part being, was a reasonable person, no, whether the conduct was inappropriate. Was it inappropriate? And the answer is no. That's why we briefed it so, well, so dramatically, in a sense, because we wanted to address each of these issues that were brought up that were speculation and innuendo. Thank you. Very briefly, the issue of the judge not ruling in a timely manner, that was their motion. That was their request. They wanted to jurisdict it. It became incumbent upon them. Otherwise, this presents a potential for gamesmanship. Did you consent to the striking of the juror? I'm sorry? Did you consent? Yes. I didn't think he should have been stricken under McDonnell. You didn't consent to the striking. You opposed the motion. Yes. The judge has something to think about. It's like you said. We agree. Get rid of him. They were the ones that didn't force a ruling in time. And so I think they've waived that. Or there's an estoppel argument here. Otherwise. I don't know about other places. But on the issue. The judges I know are not easy to force. They tend to have a mind of their own. Well, on the issue of this being just facially neutral, he said ovaries and medicine don't mix. And male doctors are better than female doctors. That's not facially neutral. That's direct evidence of an animus towards women. And in my book, that shows that the facially neutral harassment was based upon his animus towards women. And there was testimony that he did not like strong women. Thank you.
judges: Kozinski, Noonan, Edmunds